FILED
U.S. DISTRICT COURT
SAVANNAH DIV.

2010 SEP 29 PM 2: 54

CLERK
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CAREY GRAHAM,                          )
                                       )
        Appellant,                     )
                                       )
v.                                     )        CASE NO. CV409-128
                                       )
KURT GRAHAM and GRAHAM                 )
FORESTRY, INC.,                        )
                                       )
        Appellees.                     )
_____)

## O R D E R

This case is before the Court on appeal (Doc. 1) from the
January 23, 2009 Memorandum and Order of Bankruptcy Court Judge
Lamar W. Davis, Jr. (Doc. 1, Attach. 4 at 51-66.) Jurisdiction
over appeals from orders of the bankruptcy courts is vested in
the district courts by 28 U.S.C. § 158(a). For the reasons that
follow, the order of the bankruptcy court is **AFFIRMED IN PART**
and **REVERSED IN PART**. This case is **REMANDED** to the bankruptcy
court for further proceedings concerning the proper award of
damages.

### BACKGROUND

Appellee[1] filed a voluntary Chapter 12 petition on March 22,
2007. (Doc. 1, Attach. 3 at 5, 27.) Appellant attended the
meeting of creditors held on April 25, 2007. Appellee filed a

_____

[1] Due to the nature of this case, the term "Appellee" refers to
Kurt Graham individually.

complaint as an adversary proceeding against Appellant on July 16, 2007, alleging that Appellant harrowed a field Appellee leased on Farm 791, an agricultural farm composed of Tracts A through I. (Doc. 1, Attach 2. at 7-10; Doc. 1, Attach. 3 at 35.) Appellee asserted that despite receiving notice from Appellee's attorney on May 16, 2007, Appellant continued to interfere with Appellee's farming operations in violation of the automatic stay. (Id.)

The bankruptcy judge entered an order on January 23, 2009 partially resolving the adversary proceeding. (Doc. 1, Attach. 4 at 51-66.) That order awarded actual damages of $41,267.00 plus attorney's fees and punitive damages in an amount to be determined. (Id.) After a June 8, 2009 hearing (Doc. 1, Attach. 13 at 23), the bankruptcy judge awarded $30,000.00 in attorney's fees and $5,000.00 of punitive damages to Appellee. (Doc. 1, Attach. 13 at 23.) Appellant filed his notice of appeal on June 26, 2009. (Doc. 1, Attach. 13 at 32.)

Appellant's brief presents three issues for review. (Doc. 6 at 2.) First, Appellant argues the bankruptcy court erred by concluding Appellant violated the automatic stay. (Id.) This contention involves the bankruptcy court's finding that the 2004 lease was in effect during 2007 and that the lease included the disputed acres. (Id.) Second, Appellant argues the bankruptcy court erred by awarding Appellee damages in the form of lost

profits. (Id.) Specifically, Appellant contends that Appellee failed to mitigate damages and that lost profits awarded were too speculative. (Id.) Finally, Appellant alleges that the bankruptcy court erred by concluding that Appellant committed a willful violation of the automatic stay and was therefore liable for punitive damages and attorney's fees. (Id.)

## STANDARD OF REVIEW

On review from an order of a bankruptcy court, the district court will only set aside findings of fact if they are found to be "clearly erroneous." Fed. R. Bankr. P. 8013. During this review, this Court will give due regard to the "opportunity of the bankruptcy court to judge the credibility of the witnesses." (Id.) The district court is not "authorized to make independent factual findings; that is the function of the bankruptcy court." In re Sublett, 895 F.2d 1381, 1384 (11th Cir. 1990). The clearly erroneous standard of review also applies to awards of damages, attorneys fees, and punitive damages. See Holmes v. Gen. Elec. Capital Corp., 387 B.R. 896, 903 (M.D. Ga. 2008), Jankowski v. Marine Contracting Corp. (In re Rose Marine, Inc.), 1993 WL 13004542, at *10-*11 (S.D.G.A. Dec. 27, 1993) (unpublished).

In contrast, the Bankruptcy Court's conclusions of law are subject to de novo review. Chira v. Saal (In re Chira), 567 F.3d 1307, 1310 (11th Cir. 2009). Mixed questions of fact and

law are also reviewed de novo.  Bishara v. Gulfstar Indus. (In re Gulfstar Indus.), 236 B.R. 75, 77 (M.D. Fla. 1999).

## ANALYSIS

I.   UNTIMELY FILING OF APPELLANT'S BRIEF EVEN AFTER EXTENSION OF TIME GRANTED DOES NOT PRECLUDE CONSIDERATION OF APPEAL

Appellee has argued that Appellant's brief was untimely filed and, therefore, this appeal should not be considered.  For an appeal from a bankruptcy court to be dismissed, this Court must find that appellant acted with bad faith, negligence, or indifference.  In re Beverly Mfg. Corp., 778 F.2d 666, 667-68 (11th Cir. 1985).  "The time limitations imposed by Rule 8009 are not jurisdictional, and hence the district court is not required automatically to dismiss the appeal of a party who has failed to meet those deadlines."  In re Tampa Chain Co., 835 F.2d 54, 55 (2d Cir. 1987).

Appellant's untimely filing of a brief does not warrant the harsh sanction of dismissal in this case.  By Appellee's own admission, Appellant was one day late requesting an extension of time to file and delayed two days in filing the actual brief. The Court finds that this dilatory conduct, without more, does not rise to the level justifying dismissal of this appeal. Therefore, the Court now considers the merits of Appellant's arguments.

## II. THE BANKRUPTCY COURT DID NOT ERR IN FINDING THAT APPELLANT VIOLATED THE AUTOMATIC STAY

First, Appellant contends that the bankruptcy court erred in finding that a lease was in effect for Tract C of Farm 791 in 2007. Appellant proceeds by arguing that the "parties renegotiated the terms of the lease for the particular year" and thus entered a novation extinguishing the earlier year's lease. Appellee properly asserts that the issue of novation was not raised before the bankruptcy court. (Doc. 7 at 8.) Accordingly, this Court will "not consider arguments or claims not presented to the bankruptcy court." Ginther v. Ginther Trusts (In re Ginther Trusts), 238 F.3d 686, 689 n.3 (5th Cir. 2001). Regardless, the Court finds Appellant's contention to be without merit for the reasons that follow.

### A. The bankruptcy court did not err when finding that the 2004 lease continued in operation through 2007

A novation under Georgia law requires the following four elements: "1) a previous valid obligation, (2) the agreement of the parties to a new contract, (3) a mutual intention by the parties to substitute the new contract for the old one, and (4) the validity of the new contract." Powell v. Norman Elec. Galaxy, 229 Ga. App. 99, 102 (1997). Because no document contained in the record is sufficiently detailed to constitute a lease without reference to extrinsic evidence, a preliminary overview of these materials is necessary.

5

Appellee's lease interest in Farm 791's property is the result of several different documents, prior oral and written agreements, past practice between the parties, and delivery and acceptance of performance. The "Mutual Agreement Between Lessee and Lessor for Rental/Lease of Farm Cropland" dated February 2004 states that Appellee "will be renting said property in 2004 ongoing until canceled by mutual agreement between the parties signing said agreement." (Doc. 1, Attach 2. at 28 (emphasis added).) The "Farm Rental Agreement Between Kurt Graham, Julie Weddle, Ralph Graham, and Cary Graham" (Doc. 1, Attach. 3 at 38-39) was executed on February 9, 2004. The language of this agreement contemplates both the 2004 calendar year and specifically references 2005 and future years by stating "[b]eginning in year 2005 rent will be due by January 31 each year." Yet another similar undated but executed "Farm Rental Agreement Between Kurt Graham, Julie Weddle, Ralph Graham, and Carey Graham" appears in the record for the "calendar year beginning January 1, 2005 through December 31, 2005." (Doc. 1, Attach. 3 at 42-43.) Both the 2004 and 2005 agreements included a provision stating that "farm rent can not [sic] increase more than 5 percent in any given year." (Doc. 1, Attach. 3 at 40-43.)

The 2006 Lease Agreement (Doc. 1, Attach. 3. at 46) between Kurt Graham and Julie G. Weddle, Ralph Graham, and Carey Graham

provided for a term of "January 1, 2006 through December 31, 2006." However, it stated that the "lease can be renewed for the next year at the approval of the Lessors." (Id.) No part of the record indicates any "mutual agreement" to terminate this lease. Nothing in the record demonstrates a "mutual intention by the parties to substitute" any of the prior lease agreements, which specifically contemplated future terms, with one that ended any right of the parties to future rights in the land. See Powell, 229 Ga. App. at 102. The bankruptcy court did not err when finding the 2004 lease "has never been cancelled by the Lessors. Instead, it was renewed in 2005 and 2006." (Doc. 1, Attach. 4 at 52.) Therefore, the bankruptcy court correctly concluded that Appellee was entitled to "lease obligations as to Turf Farm with the exception of Tracts G, H, and D which were reserved for Loy."[2] (Doc. 1, Attach. 4 at 3.)

B.   The bankruptcy court properly concluded that Appellant had an agreement as to particular land on Farm 791 & "Tract C"

Appellant concedes that "the particular parcels were never identified in any of the leases – just total acreage." (Doc. 6 at 8.) Appellant also testified that Appellee was farming all of Farm 791, except Tracts G and H from 2004 through 2006. (Doc. 1, Attach. 8 at 30.) The record indicates that this included Tracts A, B, C, D, E, and F. (Id.) As indicated by

---

[2] From a review of the record, "Turf Farm" and "Farm 791" appear to be interchangeable.

the following testimony of Appellant, any further documentation or agreements between the parties did not impact Tract C:

> Q: So, it was your intent when you took that check that Kurt (Appellee) was to get all of the land minus the 55 acres.
>
> A: Minus 55 in addition to what Loy already had.
>
> Q: Okay. I understand that. And the proposal that you initialled [sic] indicated that Loy was to receive the 55 acres, which is Tract D . . . .
>
> A: That is correct also.

(Id. at 32.) The heart of this dispute and Appellant's incorrect assertion that Appellee had no interest in the land becomes apparent with a later exchange:

> Q: But the 55 acres your son was suppose to get is Tract D.
>
> A: That was agreed on until the lease tore up.
>
> Q: That's what he was suppose to get right?
>
> A: But he tore up the lease.
>
> Q: All right. But in the lease hadn't been tore up, your son was to get Tract D; right?
>
> A: Yes, sir.

(Id. at 35.) Appellant's testimony also clearly delineated the land that was to be Loy's and Appellee's:

> Q: At the time you initialled [sic], that was okay with you for your son to get Tract D.
>
> A: With the lease, signing of the lease. Yes, sir.
>
> Q: And it was your understanding that it was okay for Kurt to getting Tract C.

A: With the lease, yes. . . .

Q: Loy was to getting [sic] Tract D.  I've got that tract.

A: And Kurt was to get everything else.  We'll cut through the chase.

Q: Except H and G?

A: That's right.  Loy has had that all the time.

(Id. at 36.)  By Appellant's own testimony, Appellee was intended to occupy Tract C, and Tract D was designated for Appellant's son Loy.

Even if the bankruptcy court did err in finding the 2004 lease was in effect in 2007, ample evidence exists in the record to find that Appellee had an enforceable lease interest on the "Turf Farm with the exception of Tracts G, H, and D which were reserved for Loy."  (Doc. 1, Attach 4 at 53.)  Under Georgia Law, "when the parties express their intention to be bound and they specify the basic terms of the lease, the courts will enforce the contract, and thus the lease, to avoid frustrating the parties' original intent."  Doll v. Grand Union Co., 925 F.2d 1363, 1369 (11th Cir. 1991).

Appellant and Appellee signed a document indicating the terms of the lease for the 2007 calendar year.  Although Appellant's other two co-owners, Ralph Graham and Julie Weddle, had yet to sign the document, past practice of the parties

indicated that this was a formality after the process of executing the agreements began. Further, Appellee presented a check representing one third of the rental cost, $9,348.00, to Appellant. Appellant subsequently "negotiated the check, and it cleared the bank." (Doc. 1, Attach. 4 at 53.) Ralph Graham and Julie Weddle also each received rent checks for their one-third interest in the land and later cashed the checks. (Id.; Doc. 1, Attach. 10 at 7-8.)

A review of the record evidences that Appellee purchased and paid for a lease on Farm 791 for the 2007 year. Appellant appeared to rest his individual understanding of the rights of the parties and the original theory of the case on the assumption that because no "written" lease existed, Appellee did not have any right to be on the property. The facts in the record indicate the contrary, and Appellant's continued assertion of this position is incredulous. Appellant even stated in the record that he would not return Appellee's rent payment because it was too late in the season to find a substitute. Therefore, this Court would affirm the bankruptcy court's decision on these alternative grounds.

Finally, as to the specific area that was leased, the parties' lease documents are neither clear nor specific. However, the past practices between the parties indicate that Appellee had farming rights as to the entirety of Farm 791 with

the exception of G and H, which were reserved for Appellant's son Loy Graham. A separate agreement also existed whereby Loy would provide eighteen months of notice to Appellee before beginning to lease additional acreage on Farm 791. Appellee and Loy Graham entered into a "proposal" at the same time the document regarding the 2007 farm year was signed by Appellant and Appellee. However, Loy was not even present at this meeting and Appellant supposedly signed this document on Loy's behalf and not individually. Regardless, the bankruptcy judge did not err when it sorted the disputed facts in this case and concluded that Appellee maintained rights to Tract C. Further, this court would have reached the same conclusion even under a <u>de novo</u> standard of review. For the foregoing reasons, the bankruptcy court's order concerning Appellee's lease rights is **AFFIRMED**.

II. <u>APPELLEE'S DAMAGES FOR LOST PROFITS WERE TOO SPECULATIVE AS A MATTER OF LAW</u>

The bankruptcy judge erred in awarding damages for lost profits to Appellee. Normally, a plaintiff under Georgia law

> seeking to recover lost future profits argues that such profits would have been derived from a transaction that was never completed because of a contract breached by the defendant or a tort committed by him. In a case such as that, it is incumbent on the plaintiff to show <u>what revenues he would have obtained from the transaction</u>, as well as the expenses he would have incurred in generating those revenues. The <u>plaintiff must prove both anticipated revenues and expenses with reasonable certainty in order to recover</u>.

Bennett v. Smith, 245 Ga. 725, 727 (1980) (emphasis added). The burden of furnishing sufficient information to satisfy this standard is on the party seeking to recover lost profits as damages. Tendrift Realty Co. v. Hayes, 140 Ga. App. 896, 896-97 (1977).

In this case, Appellee did not submit sufficient evidence to the court to satisfy the requirements of Georgia law relating to lost profits based on agricultural farm production. An overview of Georgia appellate cases reveals that the "reasonable certainty" standard, which is a predicate to an award of lost farm profits, requires a certain level of specificity in the financial evidence presented. Where this information is either lacking or not sufficient, Georgia courts do not award lost profits as damages and instead limit recovery to "the necessary expense which the aggrieved contracting party incurred in complying therewith." Radlo of Ga. v. Little, 129 Ga. App. 530, 534 (1973).

In Morey v. Brown Milling Co., 220 Ga. App. 256 (1996), plaintiff was attempting to recover lost profits for his failed peanut crop against a defendant accused of providing a poor-performing and uncertified seed. To recover lost profits, the court required evidence comparing "crops grown in the same soil, planted under identical weather conditions, planted at the same time, and fertilized and cultivated in the same manner." Id. at

259-60. Without this evidence, a directed verdict was proper as to the lost profits claim.

In a later case, Dixon Dairy Farms, Inc. v. Conagra Feed Co., 239 Ga. App. 233 (1999), the Georgia Court of Appeals applied Morley, 220 Ga. App. 256, to a claim of a dairy farmer against a feed company accused of supplying nutritionally deficient feed. Finding that the plaintiff did not meet its burden as to lost profits evidence, the court stated that "to show lost profits, therefore, Dixon Dairy would have to compare the output of cows kept in the same location and cared for in the same manner, as well as introduce evidence of the expenses it would have incurred." Dixon, 239 Ga. App. at 236 (1999). Without this evidence, an award of lost profits was not sustainable on appeal.

In contrast, the cases that have affirmed an award of lost profits have involved certain facts far beyond what Appellee presented in this case. In DeVane v. Smith, 154 Ga. App. 442 (1980), the plaintiff alleged that the defendant negligently sprayed incorrect chemicals on his cotton field and poisoned the crop. The trial court heard evidence "as to the character of the soil, the condition of the crop prior to injury, the character of the cultivation of the cotton crop, the actual yield of the cotton crop, the probable yield of the cotton crop, the nature of the seasons, and comparisons with prior crops on

the same land" and concluded lost profits were sufficiently certain. Id. at 443 (emphasis added). All of this testimony authorized the jury to reach a determination as to the amount of lost profits.

In Glennville Hatchery, Inc. v. Thompson, 164 Ga. App. 819 (1982), the plaintiff, a chicken farmer, claimed that the defendant, the hatchery, caused a loss of profit in poultry operations by delivering bad feed. Damages were affirmed on appeal because the farmer testified at trial as to profit for the prior year, properly compared the prior year to the year that was the subject of the suit, compared attributes of production and hatchability for the disputed and the prior year, and discussed profits from the prior and disputed year. Id. at 822.

A detailed review of the record in this case indicates that the evidence required to calculate Appellee's damages with "reasonable certainty" was lacking. For example, Bucky Morrell testified that Appellee's 2006 peanut crop "was pretty bad" on Farm 791, without any reference to the tract that was used on the farm. (Doc. 1, Attach. 9 at 3.) He attributed a portion of this to "hog pressure," where animals damaged a portion of the crop. (Id. at 4.) Even Appellee's own testimony is equivocal as to the amount he expected to yield in 2007:

Q: Do you have a <u>feeling</u> for what you could have grossed up there on those peanuts?

A: <u>The exact numbers, I'm not sure.</u>  But I mean, just based on <u>my</u> years productions, <u>previous production . . . . I made as much as three tons up there before, and I've made at little as a ton.</u>

Q: There has been some indication that the year before your peanut crop got damaged by the hogs.  Is that correct?

A: 200 – don't hold me to the date.  But it was – I'm wanting to say 2006.  I had not any big acres up there.  Small acreages, <u>maybe 50 or 60, 70, 80 acres. I'm not sure.  I made the crop of peanuts.</u>  We dug the peanuts up.  They was pretty.  <u>There was probably two-ton peanuts.</u>  We come in three days later, and the <u>hogs had went in there and just picked peanuts off of the vines, scattered them out, tore off stepping on them.</u>

(Doc. 1, Attach. 10 at 4-5 (emphasis added).)  Appellee never established with any certainty the total yield of prior years' peanut crop, the location of the peanuts on the Farm during prior years, or made any comparison between farming, seasonal, or soil conditions.  Appellee never established with any certainty the number of acres that were used in production of that crop.  Instead, the approximation given was between maybe 50 to as high as 80 acres.  This attempt at establishing a prior record of profits falls well short of the standard required by Georgia law and cannot be the foundation for a finding of lost profits by a "reasonable certainty."

When questioned by Appellant's trial counsel, Appellee admitted his 2006 average peanut yields were "pretty bad" and "less than a ton." (Doc. 1, Attach. 10 at 32.) When Appellant's trial counsel pressed Appellee for answers regarding acreage, the conversation included the following exchange:

Q: Sir, in 2006, you grew 71.6 acres of peanuts. Is that correct, on that farm, irrigated peanuts?

A: If that is what my file 78 says. I don't have none of that paperwork in front of me.

Q. Well, if you don't know you don't know. That will be an acceptable answer.

A: Okay.

Q: Do you know what your yield was in 2006 on irrigated peanuts on this land?

A: No, I don't.

Q: In 2005, you grew how many acres of peanuts on this farm.

A: I don't know.

Q: You have no idea.

A. Not without paperwork.

Q: Do you have any idea -- well, you reviewed the paperwork the other day. Is that correct?

A: I was reading through it. Yeah, I seen kind of what my yields were.

Q: And your yields in 2005 on the irrigated peanuts on this farm were what.

A: I think it was up there around 3700 pounds.

Q: 3700?

A: Uh-uh.

Q: Not a thousand pounds?

A: No.

Q: Now did you report to Billy Dasher that you grew peanuts on this farm in 2003?

A: I probably did.

Q: Well, how did you –

A: No. For 2003, I said I thought it was corn.

Q: Did you report to Billy Dasher that –

A: I reported my yield, I imagine.

Q: Did you report to Billy Dasher in 2003 that you grew 47.2 acres on that farm, and made 5,377 pounds per acre?

A: In 2003, you said.

Q: Did you—

A: What year?

Q: Let me repeat the question. Did you report to Billy Dasher that in 2003 on Farm No. 791 you grew 47.2 acres of peanuts and averaged 5,377 pounds per acre?

A: Yeah, I thought it was more like 3-tons, 6,000 and something pound.

(Doc. 1, Attach. 10 at 33-34.) Appellee appeared to have no personal knowledge of the amount of peanuts he had farmed in the past or the yields from the acres that he had farmed for peanuts in the past. The paperwork Appellee referenced in his testimony did not appear in the record. Even for the years where Appellee

17

did recall acreage and yield per acre, no reference was made to the fields that were planted or how that soil compared to Tract C. Appellee also did not sufficiently compare any growing season to the 2007 year. The best attempt at this was through Wendell Brannen, an expert in the field of "the production of peanuts and other row crops and the cost of producing them." (Doc. 1, Attach. 10 at 50.) The evidence presented was "preliminary cost projections" for each crop; although the expert testified that 2007 was "pretty stable," he noted that there "wasn't an awful lot of change" between those projected figures to actual figures. Id. at 52.

While this was not necessarily fatal to Appellee's attempt to establish production costs, the testimony ultimately falls short. Although the expert reported "projected" "total expenses of $369.96" per acre to plant and harvest peanuts, Wendell Brannen qualified his response by stating that the calculation "does not include any fuel, labor, depreciation on equipment" and was "purely out-of-pocket expenses." (Id. at 54.) Further, even at this incomplete amount of expenses, the "break even" point was "1850 pounds an acre." (Id.) The calculations also did not include land rent. (Id.)

The linchpin of this expert's testimony was revealed in his projections as to Appellee's profit, his methodology, and his degree of certainty regarding those calculations:

18

Q: Now what would you project had he planted those peanuts, how many pounds of peanuts would you think he would have produced per acre? And when you tell me that, I want you to tell me how you came up with that number.

A. Well, it is awful hard -- it's awful difficult -- and I don't want to mislead anybody at all. But it is awful difficult to predict and theoretically say what anybody can make when you are doing comparisons. But in that particular area in 2007 was just as good as it was sorry probably in 2005. That was a good area for peanuts.

The only peanuts we buy in that particular locality over there, that is in close proximity to where Kurt's farm is, is Bucky Morrell's. And it is not a long way from there. And then Johnny Lacriar is in back closer to Newington, in the Newington area. Both of them, all of them are good farmers. Bucky made exceptionally good peanuts that year. And they were dry land.

He planted -- I can't remember all of the names of those landowners, but he had peanuts all the way from the property over by Belfair Plantation all the way back up to his dad's old home place. And all of them were pretty good peanuts. I think Bucky picked about 4,000, 4100 pounds of peanuts an acre that year, on pretty significant areas.

The peanuts that John Emory had, the closer you got to Kildare, the better they are, because that's where the rain really started that particular year. That is the one ingredient that a farmer can't control, is moisture.

And that particular year, 2007, there was ample rainfall in that area. Now, you got back close to Newington, right around Newington, it got dry again. But the peanuts that we bought from Pryor Road back toward the Savannah River that year were all in that 3500 to 4,000-pound range dry land.

And to be quite honest with you, in that area over there, I don't see a lot of -- it's a very rare occasion -- it has got to be an extremely dry year when the irrigation makes you a lot of money. I'm just

being honest would you. Because that is good peanut dirt period. And you get any moisture at all in a typical year, you are going to make a good crop of peanuts over.

Q. What did you project that Kurt would have made, pound per acres out there?

A. I think in the 3700 pounds per acre. I didn't think -- and there's no great magic in how -- I'm not a rocket scientist. I got that figure by pulling it directly off of Bucky's and John Emory's to be quite honest with you, and do an average of their two.

Q. Okay. And they were planting dry peanuts.

A. Yeah.

(Doc. 1, Attach. 10 at 55-57 (emphasis added).)

Essentially, Appellee failed to provide any detailed farm data that related to his personal farming experience or Farm 791. Appellee's expert testified as to the farming outcome of farming operations that were near Appellee's farm geographically, but provided no additional grounds for comparison. Additionally, the comparison farms were "dry" land while Appellee intended to plant on irrigated farmland. The expert's approximation was based on a simple average of nearby farms without any other comparison as required by Georgia law.

The testimony regarding the gross revenue from peanuts and the market price during 2007 was equally unclear. Although the testimony provided a chronological history of the market price of peanuts, it provided no indication of what price Appellee would have received for his peanuts or when he would have, if

ever, entered into a contract for sale that locked in a certain price. The absence of this evidence is significant because the prices ranged from $415 to nearly $500 per ton during the 2007 growing season. The expert's testimony was as follows:

Q: And what was the price that those peanuts brought in 2007?

A: That's an awful hard one to pinpoint. They started off contracted at 415. Farmer were reluctant to sign a 415-dollar a ton contract because they were -- we were coming into a market that we knew there was not a big carry over of peanuts. So we had probably 40 to 50% of the people sign that 415 contract. And then when it come time -- that was in January, maybe January or February. Then when it got time to plant, you had another sector that said hey, I'm not comfortable planting peanuts and they not contracted. So they contracted a few more right at planting time. And then the market started going up. And the market ultimately went to $500.

So most of the average selling price, B.J. and I bought, that year, we bought 18,000 and some few tons of peanuts. It was limited acres. There wasn't as many acres of peanuts planted. We bought 18,000 and some few tons of peanuts. And the average price that was paid by us for peanuts that year was $483 a ton. And that is the rationale behind that figure.

If Mr.Graham or anybody else had contracted peanuts early on, they have gotten 415 for them. If they had not contracted, they had a potential to sell them for $500 a ton that year.

Q. But you paid an average of 483.

A. Of 483.

Q. And that is what you came up with in your computation. Is that right?

A. Well, <u>I didn't know any other way to arrive at a figure</u>.

(Doc. 1, Attach. 10 at 57-58 (emphasis added).)

In addition to insufficient information as to projected yields for 2007 and without any detailed indication as to what revenue Appellee would have received, Appellee's required expenditures to produce the peanut crop were equally uncertain and admittedly separate from reality because of the cost drivers excluded from the calculations:

> Q: But let's look at these expenses. I'm assuming that you relied on your chart here that you prepared that we've put in as Defendant's Exhibit 24. And I would like for you to go there and explain to the Judge how you came up - now I noticed that you used 319.96, but that would be less the rented land of $50 an acre. Is that right?

> A. That's correct. And I think you told me when I was preparing this thing that he would not have had to pay land rent that particular year is the reason I did that. It is very -- it was a very simple process. And I want to substantiate even more, because I want to make sure I don't mislead anybody. But you take the expenses, the production that I had anticipated he had potential to make that year. And you take the enterprise budget that I had done, which stayed pretty well in tact [sic]. They didn't much change.

> And if he had done that on a 110 acres, he would have had a profit after expenses, out-of-pocket expenses of $63,084.90. <u>But I do want to tell you, Mr. Franklin, whether you want to hear it or not, or whether anybody wants to, I don't think I've ever seen anybody take 110 acres of peanuts and make $63,084.90 before. It just doesn't work that way. This is paper.</u>

> But I do think there was a lot money in peanuts that year. I think it was <u>very conceivable</u> that Kurt would have made a significant income on peanuts. <u>And the</u>

> reason I say this, just what I said a while ago,
> you've got fuel, labor, and you are going to always
> have maintenance and repair on equipment, and stuff.
> But the figures are real. I don't have any problem
> substantiating the figures that I used in there.

(Doc. 1, Attach. 10 at 59-60 (emphasis added).)    Later efforts

at trial to fill these gaps with additional testimony were again

based on averages and approximations that were not specific to

Appellee's prior farming performance.

Finally, and more than any other piece of evidence,

Appellee's own crop yields indicate that the likelihood of a

profit was not "reasonably certain."    Appellant called

Appellee's crop insurance agent, Billy Dasher, Jr. to testify

during the trial.    (Doc. 1, Attach. 11 at 67.)    Mr. Dasher

testified that Appellee planted 47.2 irrigated acres of peanuts

in 2003 with a yield of 5,377 pounds.    (Doc. 1, Attach. 12 at

1.)    In 2004, Appellant planted 40 irrigated acres of "Virginia"

peanuts and had a yield of 4,562 pounds per acre.    (Id. at 1-2.)

However, in 2005, Appellant planted 138.8 irrigated acres of

peanuts and reported a yield of 1,021 pounds per acre.    (Id. at

2.)    In 2006, Appellee planted 71.6 acres of irrigated peanuts

and harvested a yield of 691 pounds per acre.    (Id. at 7.)

If anything, Appellee's peanut farming yield was trending

downward.    Far from showing any consistent performance data or

forecasts of likely future yields, the data produced at trial

indicates only uncertainty at best or a downward trend at worst.

The Court concludes that Appellee failed to produce sufficient evidence required by Georgia law to satisfy the "reasonable certainty" standard, which is a prerequisite to the award of lost profits. Therefore, the bankruptcy court's award of lost profits to Appellee is **REVERSED.** On remand, the bankruptcy court should award an alternative measure of Appellee's damages since the amount of lost profits was not shown to a "reasonable certainty."

III. APPELLEE'S MITIGATION OF DAMAGES ARGUMENT IS NOW MOOT

Based on this Court's decision regarding the insufficient level of evidence as to lost profits above, Appellee's mitigation of damages argument need not be addressed.

IV. THE BANKRUPTCY COURT DID NOT ERR IN FINDING APPELLANT LIABLE FOR ATTORNEY'S FEES AND PUNITIVE DAMAGES

Appellant argues that the bankruptcy court erred in finding that a violation of the automatic stay caused injury and that the violation was willful. For the reasons above, this Court affirms the bankruptcy court's decision as to the violation of the automatic stay. The issue of whether the violation was willful appears to be one of fact. As noted above, the district court is not "authorized to make independent factual findings; that is the function of the bankruptcy court." In re Sublett, 895 F.2d 1381, 1384 (11th Cir. 1990).

24

"For a violation of an automatic stay to be 'willful,' all that is required is that an entity engage in a deliberate act to violate a stay with the knowledge that the debtor has filed for bankruptcy." United States v. Washington (In re Washington), 184 B.R. 172, 174 (S.D. Ga. 1995). Appellee's brief succinctly summarizes why Appellant's actions were willful by stating, "it was certainly apparent to any observer that Tract C had been prepared for planting." (Doc. 7 at 14.) Further, even after being warned in a letter from Appellee's counsel that Appellant's actions were a violation of the stay, Appellant continued to harrow Tract C. Appellant's knowledge of the bankruptcy proceedings is not in dispute due to his attendance of the meeting of creditors. Ample evidence appears in the record to support the bankruptcy court's finding that Appellant's violation of the automatic stay was willful. Appellant's third enumeration of error is, therefore, without merit.

However, on remand, the bankruptcy court may modify or alter the amount of punitive damages or attorneys fees in light of this court's ruling regarding damages for lost profits.

## CONCLUSION

For the reasons above, the decision of the bankruptcy court is **AFFIRMED IN PART** and **REVERSED IN PART**. This case is **REMANDED** to the bankruptcy court for further proceedings and

determination of an alternative measure of Appellee's damages since the amount of lost profits was not shown to a "reasonable certainty." Based on this Court's ruling, the bankruptcy court may modify the award of attorney's fees or punitive damages.

SO ORDERED this 29th day of September 2010.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA